United States Court of Appeals
Fifth Circuit

**F I L E D**

June 11, 2004

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 03-21119
_____

WASTE MANAGEMENT, INC.,

Plaintiff - Appellee,

versus

RESIDUOS INDUSTRIALES MULTIQUIM, S.A. de C.V.,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

Before JOLLY, DUHÉ, and STEWART, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Waste Management, Inc. ("WM") sued Residuos Industriales Multiquim, S.A. de C.V. ("RIMSA") on various equitable claims in Texas state court. RIMSA removed the case and filed a motion to stay litigation in the light of an ongoing arbitration between WM and RIMSA's parent company, CGEA Onyx, S.A. ("Onyx"). The district court denied the motion, and RIMSA appealed. WM, contending that because RIMSA had no right to a mandatory stay under 9 U.S.C. § 3, filed a motion to dismiss this interlocutory appeal for lack of appellate jurisdiction. We hold that even though RIMSA is not a party to the arbitration agreement, we have appellate jurisdiction and RIMSA is entitled to a mandatory stay because WM's claims

against RIMSA are based on the same operative facts, are inherently inseparable from those against Onyx, and the present suit could have a critical impact on the pending arbitration. Consequently, we reverse the denial of the motion to stay litigation, and remand to the district court for entry of such an order.

I

In January 2000, RIMSA agreed to lease some heavy equipment from The Bethlehem Corporation ("Bethlehem") for use in its hazardous waste disposal operations. Bethlehem required a performance guarantee from WM, which was RIMSA's parent company at the time. WM provided this guarantee and secured it with a $795,000 Letter of Credit (the "Letter"). Under the Letter, Bethlehem was entitled to draw on the security if an authorized Bethlehem officer certified that RIMSA was in default on the lease.

In August 2000, WM sold its shares in RIMSA to Onyx, in a Stock Purchase Agreement (the "SPA") that closed in November of that year. The SPA contained a broad agreement to arbitrate under the auspices of the International Chamber of Commerce ("ICC"), as well as a general release (the "Release") between WM and RIMSA.

In late November, RIMSA made a partial late payment on its lease, alleging that such action was justified by Bethlehem's failure to properly maintain the equipment under the contract. RIMSA then failed to make its December payment. Bethlehem responded to the now-$60,000 shortfall by collecting on the entire

2

$795,000 Letter.  WM reimbursed the bank for these funds, plus fees and expenses.

In May 2002, Onyx initiated an ICC arbitration against WM on claims arising out of the SPA.  WM filed a counterclaim, alleging a breach of contract and seeking reimbursement for the funds WM paid relating to the Letter.  Onyx initially objected to the ICC's jurisdiction over the counterclaim, contending that the counterclaim dispute was not subject to the arbitration agreement between it and WM because it involved the Letter that was solely between RIMSA and WM.

On August 8, 2002, at the same time it was asserting its breach of contract counterclaim before the ICC, WM sued RIMSA in Texas state court to collect against the monies it had paid on the Letter.  The case was removed to federal court, where RIMSA then filed a derivative third-party complaint against Bethlehem, alleging that Bethlehem was the entity that caused the damages sought by WM.  On August 22, 2003, WM moved for summary judgment. (RIMSA also has a summary judgment motion pending.)

Meanwhile, in the ICC proceeding, Onyx withdrew its jurisdictional objections to WM's counterclaim and, in December 2002, the parties agreed to arbitrate WM's counterclaim.

Soon thereafter, RIMSA filed an emergency motion in the district court to stay litigation (the "Motion to Stay") based on the ongoing arbitration between WM and Onyx -- which, as a result of the agreement between WM and Onyx, was now to include the

dispute over the Letter, the subject of the instant case. On October 22, 2002, the district court summarily denied the Motion to Stay. RIMSA filed a timely notice of interlocutory appeal, but the district court denied a stay pending appeal. WM then filed a motion in this Court to dismiss for lack of appellate jurisdiction, arguing that RIMSA is not a party to the arbitration agreement and thus cannot take an interlocutory appeal. On December 24, this Court granted a stay pending appeal, carried WM's jurisdictional motion, and accelerated this appeal.

## II

This Court reviews a district court's denial of a motion to stay litigation pending arbitration *de novo*, using the same standard as the district court. Texaco Exploration & Prod. v. AmClyde Engineered Prods., 243 F.3d 906, 909 (5th Cir. 2001); Harvey v. Joyce, 199 F.3d 790, 793 (5th Cir. 2000). We must first consider, however, whether we have jurisdiction to hear this appeal.

## A

RIMSA urges that we have appellate jurisdiction under § 16(a)(1) of the Federal Arbitration Act ("FAA"), which provides that an interlocutory appeal may be taken from "an order refusing a stay of any action under section 3 [of the FAA]." 9 U.S.C. § 16(a)(1); Adams v. Ga. Gulf Corp., 237 F.3d 538, 541 (5th Cir. 2001) ("Through Section 16, Congress intended to promote

4

arbitration by 'permitting interlocutory appeals of orders favoring litigation and precluding review of interlocutory orders that favor arbitration.'") (citation omitted). Given the language of § 16(a)(1), this Court will have jurisdiction to review the district court's order if § 3 applies to RIMSA's motion for a stay.[1]

Although § 3 usually applies only to the parties to an arbitration agreement, Adams, 237 F.3d at 540, RIMSA argues that this appeal presents the case when a non-signatory has the right under § 3 to request a mandatory stay pending arbitration, Hill v. Gen. Elec. Power Sys., Inc., 282 F.3d 343, 348 (5th Cir. 2002). WM disputes RIMSA's assertion on the ground that its claims against RIMSA are wholly separate from the claims being arbitrated with Onyx, and consequently any right that RIMSA may have does not arise under § 3; this being so, this Court has no appellate jurisdiction over this interlocutory appeal.

---

[1]Section 3 reads:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall *on application of one of the parties* stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added).

Thus, the first issue we must resolve is whether § 3 gives RIMSA standing to invoke the arbitral rights of the signatories to an arbitration agreement. A parsing of the language of § 3 demonstrates that, in certain limited circumstances, non-signatories do have the right to ask the court for a *mandatory* stay of litigation, in favor of pending arbitration to which they are not a party. That is, in any suit brought in federal court "upon any issue referable to arbitration" under a written arbitration agreement, "the court . . . *shall* on application of one of the parties" stay the suit. 9 U.S.C. § 3 (emphasis added). The grammatical structure of this sentence would seem to make clear that *any* of the parties to the suit can apply to the court for a mandatory stay, and the court must grant the stay if the claim at issue is indeed covered by the arbitration agreement. Although the final phrase of the statute -- "providing the applicant for the stay is not in default in proceeding with such arbitration" -- suggests that Congress contemplated that the litigant applying for the stay would also be a party to the arbitration, the preceding language allows for the anomalous situation where a non-signatory requests a stay of litigation on an issue covered by an arbitration agreement.

To that end, we have ordered stays on the application of non-signatories in three recent cases. In <u>Subway Equipment Leasing Corp. v. Forte</u>, we applied § 3 to non-signatory affiliates of a

6

signatory corporation, where the claims against them were based entirely on rights arising from the contract containing the arbitration clause.[2]  Similarly, in <u>Harvey</u>, we invoked § 3 on behalf of a non-signatory corporation whose potential liability arose and was inseparable from the claims against its signatory owner.[3]  Most recently, in <u>Hill</u>, we applied § 3 where a non-signatory lender's potential liability was inherently inseparable from claims against the second party to an arbitration agreement.[4]

To clarify, were it not for § 3's broad grant of statutory authority to enforce arbitration agreements, non-signatories would be hard-pressed to assert rights to mandatory stays of litigation: They would not have rights arising from contract or statute or perhaps even Article III.  As was implicit in <u>Subway</u>, <u>Harvey</u>, and <u>Hill</u>, however, § 3 gives a non-signatory litigant standing to apply for a stay when the litigation involves "any issue referable to arbitration."  Thus, if WM's claims against RIMSA are "referable to arbitration," RIMSA has standing to move for a stay and we have jurisdiction to review its denial.

_____

[2]169 F.3d 324, 329 (5th Cir. 1999) (litigation would have adversely affected the signatory's right to arbitration) (citing <u>Sam Reisfeld & Son Import Co. v. S.A. Eteco</u>, 530 F.2d 679, 681 (5th Cir. 1976), which was a case decided before the enactment of § 3).

[3]199 F.3d at 795 (if lawsuit against non-signatory were allowed to proceed, it would have a critical impact upon the arbitration).

[4]282 F.3d at 348 (permitting suit to go forward would undermine the arbitration proceeding and thus thwart federal policy).

The key issue in evaluating our jurisdiction over this appeal -- whether WM's claims against RIMSA are "referable to arbitration" such that a stay of litigation under § 3 would be mandated -- is therefore identical to the substance of this interlocutory appeal; that is, we must determine whether WM's claims against RIMSA are covered by the arbitration agreement that covers its claims against Onyx.[5]

B

We thus turn to the issue of whether WM's claims against RIMSA, a non-signatory, are "referable to arbitration" under the agreement with Onyx. Synthesizing this Court's precedent, several factors emerge for invoking § 3 on the application of a non-signatory: 1) the arbitrated and litigated disputes must involve the same operative facts; 2) the claims asserted in the arbitration and litigation must be "inherently inseparable"; and 3) the litigation must have a "critical impact" on the arbitration. See, e.g., Hill, 282 F.3d at 347; Harvey, 199 F.3d at 795-96.[6] The

_____

[5]As WM points out, this is somewhat of a Catch-22: we could not reject jurisdiction after finding that RIMSA is entitled to a stay, or find that no stay is warranted while maintaining jurisdiction. We must thus either reverse the district court or dismiss for want of jurisdiction after having reached the substance of the appeal.

[6]RIMSA refers to these three factors as a "three-part test" for evaluating the application of the FAA to a non-signatory. WM instead suggests that this Court has adopted the position that a stay should be granted to a non-signatory only in "exceptional" or "rare" circumstances. Adams, 237 F.3d at 540-41 ("[in Subway and Harvey] we were confronted with exceptional circumstances."). It is apparent from reading the cases in question that neither party

8

question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration. Adams, 237 F.3d at 241.

1

WM argues that its claims against RIMSA and Onyx are based on different legal theories, different elements, and different factual underpinnings. First, the operative facts are different because those relevant to an equitable claim (to prove whether RIMSA did anything that obligates it to repay the Letter) diverge from those relevant to a contract claim (to help interpret the SPA and its obligations). And none of Onyx's defenses -- that it was not a party to the Letter, that it did not improperly operate RIMSA after acquiring it -- are at play in the litigation. Thus, while there is a veneer of similarity, the operative facts do not mesh.

Second, WM argues that the arbitration and litigation are not "inherently inseparable" because they focus on fundamentally different theories of law and elements of the causes of action. Given the different elements that must be proved to establish unjust enrichment on one hand and breach of contract on the other, the parallel proceedings could result in a finding of liability against neither, one, or both of RIMSA and Onyx (with possible

is precisely correct; there is neither an explicit balancing test nor a bright line rule. The factors formulated above recur in the relevant precedential language but they are neither required (in that articulation) nor exhaustive.

rights of contribution).  Equitable and legal theories cannot be "inseparably intertwined."  In contrast, WM asserts, the <u>Harvey</u> non-signatory's liability was completely derivative of the signatory's, so the result of one dispute *necessarily* determined the result of the other.  <u>Harvey</u>, 199 F.3d at 795.

 Third, although WM acknowledges that the litigation may affect the arbitration in some way, perhaps in a substantial way, WM contends that it will not have a "critical" impact rendering the arbitration "both redundant and meaningless."  <u>Harvey</u>, 199 F.3d at 795-96.  Even if the arbitrator would feel bound by the district court, the cases are sufficiently different that the arbitrator's fact-finding and legal rulings would not be obviated.  And if no stay is granted, the arbitration and litigation would still progress on parallel tracks -- potentially arriving at different results in terms of whether the particular defendant bears liability but not repeating each other.

On the other hand, RIMSA points to the well-established federal policy favoring arbitration (particularly in international commerce), and argues that the district court disregarded the significance and scope of the WM-Onyx arbitration.  As WM does not contest the validity of the SPA's arbitration provision, Onyx's agreement to arbitrate WM's counterclaim (seeking reimbursement for the Letter) should foreclose the instant litigation.

RIMSA suggests that a dispute falls into the scope of the arbitration clause if a reasonable relationship can be found between the subject matter of the dispute and the general subject matter of the contract. See, e.g., Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, 198 F.3d 88, 99 (2d Cir. 1999). Courts determining whether a particular claim falls within the scope of the arbitration agreement "focus on factual allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying those claims 'touch matters' covered by the parties' . . . agreements, then those claims must be arbitrated, whatever the legal labels attached to them." Id. (citations omitted). Thus, because the factual allegations underlying WM's claims against RIMSA are *identical* to those underlying its claims against Onyx -- and given that the arbitration agreement encompasses "any dispute . . . relating to [the SPA]" -- the subject of this litigation is subsumed by the ongoing arbitration (to which WM has consented).

WM replies that "[a]rbitration does not require parties to arbitrate when they have not agreed to do so." Will-Drill Res., Inc. v. Samson Res. Co., 352 F.3d 211, 217 (5th Cir. 2003). There is no contractual agreement to arbitrate between WM and RIMSA, so RIMSA has no right to stay litigation or to appeal the interlocutory order denying the stay. Cerveceria Cuauhetmoc Moctezuma S.A. de C.V. v. Montana Beverage Co., 330 F.3d 284, 287

11

(5th Cir. 2003). WM argues that RIMSA is attempting to circumvent the lack of arbitration agreement between them by "insinuating itself into" the (separate) WM-Onyx arbitration. It asserts that its equitable claims against RIMSA have nothing to do with an interpretation of the SPA -- and consequently with the pending arbitration with Onyx. Thus its claims against RIMSA would be identical even if the SPA never existed.

2

In the light of the parties' arguments, we will now consider the factors for invoking a § 3 stay on the application of a non-signatory: the similarity of operative facts, the inseparability of claims, and the effect of the litigation on the arbitration.

First, it is clear that the same major operative facts -- the details of the Letter and its negotiation -- largely control the resolution of both the equitable claims being litigated and the contractual claims being arbitrated. Other operative facts, such as the circumstances surrounding the draw on the Letter, the propriety of Bethlehem's actions, and the scope of the Release, are also at issue in both disputes. And Onyx's defenses do not influence a determination of whether WM's claims against RIMSA and Onyx are based on the same operative facts. Indeed, the facts of this case are similar to Harvey, which also involved claims against both a signatory and a non-signatory arising from an agreement between the plaintiff and the signatory regarding liability based on ownership interest in the non-signatory company.

12

Further, WM's claims in the litigation and arbitration are, with respect to the Letter, at least as "inseparable" as the claims in Harvey, which were, after all based on *separate* contracts. Much as in Harvey, where the non-identical legal theories involved breach of fiduciary duty against the signatory and unjust enrichment against the non-signatory, here WM asserts only breach of contract against Onyx but several equitable claims (unjust enrichment, restitution, breach of subrogated contract) against RIMSA. The Harvey court concluded that the non-identical claims were nevertheless inseparable because the plaintiff was merely seeking different remedies for the same violation. 199 F.3d at 795. Similarly, when WM claims RIMSA was unjustly enriched when WM paid Bethlehem's draw on the Letter, while also claiming that Onyx breached the SPA in not reimbursing WM, it is trying to recover the *same* payment, for which both RIMSA and Onyx have refused to pay and for which both are allegedly liable.

Finally, there is a valid concern here about the integrity of the arbitration and the preservation of Onyx's and WM's rights to that contractual agreement. Allowing the instant litigation to proceed would risk inconsistent results, and "substantially impact" the arbitration. Given the binding effect of a federal judgment, as well as the factual similarities in WM's asserted claims, the ICC arbitrator would necessarily be strongly influenced to follow the court's determination. See, e.g., Subway, 169 F.3d at 329.

13

That is, Onyx's liability will incontrovertibly be seriously affected by the court's determination of RIMSA's liability.

Fundamentally, we have one dispute: Who, if anyone, should reimburse WM for the $795,000 it paid to Bethlehem (through the Letter) as a result of RIMSA's default? WM's argument based on the differences in its legal and equitable theories is not a plausible defense to this arbitration; it is the violated right that matters, not the purported remedy. WM only suffered one alleged harm, so the resulting litigation and the arbitration are "inherently inseparable" from the instant litigation, at least to the extent Harvey, Hill, Subway and Sam Reisfeld were.

In sum, we have jurisdiction to consider this appeal because the district court denied a motion to stay litigation brought by one of the parties despite the issues herein being "referable to arbitration" under a written agreement to arbitrate. It follows that RIMSA was entitled to a mandatory stay under § 3. In denying a mandatory stay under § 3, the district court erred in its application of the FAA and this Court's precedent to the facts of this case.

                            III

For the foregoing reasons, we DENY the motion to dismiss this appeal for lack of jurisdiction, REVERSE and VACATE the denial of the motion to stay litigation, and REMAND to the district court with instructions to enter such a stay.

14

MOTION DENIED; REVERSED, VACATED, AND REMANDED WITH INSTRUCTIONS TO ENTER STAY OF LITIGATION.