

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00299-CV

———————————————

MAIRENI PEGUERO; BRAD YOUNG; AND DYNO PETRO, LLC, Appellants

V.

JERRY FREISHTAT AND JUSTIN FREISHTAT, Appellees

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-362898-25

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

In this appeal, we address whether Appellees Jerry Freishtat and Justin Freishtat's (the Plaintiffs) claims against various signatories and nonsignatories to an oil-and-gas investment agreement should have been compelled to arbitration. Appellants Brad Young and Dyno Petro, LLC and Appellant Maireni Peguero filed separate briefs, but they collectively challenge whether the trial court properly enforced an arbitration clause in Subscription Agreements between the Plaintiffs and Dyno Petro.

Initially, Appellants contend that though the trial court compelled arbitration of the Plaintiffs' claims against Dyno Petro and Young (Dyno Petro's president), it erred by failing to compel arbitration of the claims against the nonsignatories of the Subscription Agreements. Appellants argue that either (1) the decision was error because the nonsignatories were agents of Dyno Petro or (2) the Plaintiffs' claims against the nonsignatories are an attempt by the Plaintiffs to obtain a benefit from the Subscription Agreements without accepting its burdens and thus estop the Plaintiffs from challenging the nonsignatories' right to the protection of the arbitration clause. Appellants also challenge the duration of a stay that the trial court imposed. The Plaintiffs challenge Appellants' contentions on the merits and also argue that Dyno Petro has no appellate standing to raise a claim on behalf of the nonsignatories who did not file a notice of appeal.

2

We resolve the parties' arguments as follows:

- We reject the Plaintiffs' contention that Dyno Petro lacks standing to challenge the trial court's failure to compel arbitration of the nonsignatories who did not file a notice of appeal. Dyno Petro has a sufficient personal stake in the question to have appellate standing.

- We hold that the trial court did not err by failing to compel arbitration for two of the nonsignatories. Dyno Petro's own witness left the question open regarding whether the two nonsignatories were its agents; in that circumstance, the trial court did not abuse its discretion by refusing to compel arbitration as to them. However, one of the nonsignatories was indisputably an employee of Dyno Petro, and the trial court erred by failing to compel arbitration of the claims against him. Also, we conclude that the Plaintiffs were not estopped to challenge the right of the nonsignatories whose status was left unclear as to arbitration.

- Because the stay has expired as to the claims that the trial court compelled to arbitration, we remand this matter to the trial court to reformulate a stay that addresses those claims and whether the claims that were not compelled to arbitration should also be stayed.

Thus, we affirm in part and reverse in part.

## II. Factual and procedural background

The Plaintiffs seek to recover damages for what they contend is an ill-fated oil-and-gas investment. In their original petition (which was the live pleading at the time of the trial court's order), the Plaintiffs sued five Defendants: (1) Dyno Petro, the company in which the Plaintiffs had invested; (2) the company's president, Young; and (3) three individuals—Maireni Peguero, Arturo Torres, and Darrin Hunter. The trial court did not compel these three individuals to arbitration, and it is primarily the

3

shifting descriptions of the individuals' capacities with Dyno Petro that are the crux of whether that decision was correct.

The petition's "FACTS" described the Plaintiffs' initial interactions with respect to the investment as follows:

12. On or about December 2, 2022, while attending an event in Gatlinburg, Tennessee, [the] Plaintiffs were approached by Torres and Peguero, who represented [that] they were agents of Dyno Petro presenting an enticing investment opportunity on behalf of Dyno Petro. Shortly after meeting with Torres and Peguero, [the] Plaintiffs were contacted by Brad Young, owner and CEO of Dyno Petro, about the investment opportunity. Torres, Peguero, and Young each indicated that Dyno Petro was actively engaged in the exploration, development, promotion, and production of oil[-]and[-]gas assets across the United States. Young boasted about his experience in [the] oil[-]and[-]gas industry and noted that he had over 100 wells in operation at that time. [The] Plaintiffs were told that Dyno Petro had recently acquired a lease for oil[-]and[-]gas production on real property identified as the "Grand Coteau" Property located in Lafourche Parish, Louisiana (hereinafter, the "Grand Coteau Property").

13. The investment opportunity presented by Torres, Peguero, and Young on behalf of Dyno Petro would represent the fractional interest of oil[-]and[-]gas production of a well to be drilled on certain real property located in Lafourche Parish, Louisiana, which Dyno Petro identified as the "Grand Coteau Property." Specifically, Plaintiffs were told Dyno Petro already had an existing well on the Grand Coteau Property and that it was giving prospective investors the opportunity to purchase Units representing . . . fractional Working Interests in the production of a second well to be drilled on the Property, which Dyno Petro identified as "Grand Coteau #2." Each Unit offered by Dyno Petro was priced at $20,000 and represented 0.5% of the Working Interest in the Grand Coteau #2 well. Dyno Petro's total offering included the sale of up to 100 Units.

14. Following the initial pitch, Torres, Peguero, and Young provided additional marketing containing further information about the investment. Dyno Petro's marketing materials indicated that investors

4

would become partners in the operation and have true ownership of the oil[-]and[-]gas production on the Grand Coteau Property. By these materials, Dyno Petro affirmatively represented that an existing well on the property had produced up to 955 barrels of oil per day and [had] accumulated a total of 206 million barrels of oil.

Thus, the petition described Torres and Peguero as representing that they were agents of Dyno Petro. The petition went on to describe Peguero's and Young's representations, including representations that occurred after the investment was made. Hunter's role is described in the "FACTS" as follows: "In March 2024, . . . Hunter assumed the role of President at Dyno Petro and began serving as the primary point of contact between [the] Plaintiffs and Dyno Petro."

The petition alleged a number of causes of action that included fraud, unjust enrichment, breach of fiduciary duty, violation of the Uniform Fraudulent Transfer Act, conspiracy, and alter ego. The causes of action other than fraud were alleged against only Dyno Petro and Young. The fraud claim alleged against all the Defendants (i.e., Young, Hunter, Torres, Peguero, and Dyno Petro) stated as follows:

> On or about December 3, 2022, and in the weeks that followed, Dyno Petro, by and through its employees, Torres and Peguero, and its owner, Brad Young, represented to Plaintiffs [that] they were offering an investment in the working interest of a new well being drilled on the Grand Coteau Property and that, should [the] Plaintiffs invest, it would be very profitable.

Hunter's involvement is described as coming later:

> After [the] Plaintiffs made their initial investments, Young and Hunter continued misrepresenting the nature of the investment to [the] Plaintiffs by stating that the well was producing substantial amounts of

5

oil and gas per day and that [the] Plaintiffs would receive significant disbursement checks from the sale of said oil and gas.

The Plaintiffs invested and each signed a Subscription Agreement to document their respective investments. Those Subscription Agreements contained a broad-ranging arbitration clause that provided in material part that

[i]n the event that a dispute arises between the undersigned subscriber and the company or any of their legal representatives, officers, shareholders, attorneys, accountants, agents[,] or employees, said dispute arising out of, in connection with[,] or as a result of the subscription hereby made, the undersigned hereby expressly agrees that said dispute shall be resolved through arbitration rather than litigation.

The various Defendants answered the Plaintiffs' suit, and then Dyno Petro and Young filed a motion to compel arbitration that contended in part that

[Dyno Petro] entered into a valid and enforceable written agreement to arbitrate with [the] Plaintiff[] Justin Freishtat on December 14, 2022. [Dyno Petro] entered into a valid and enforceable written agreement to arbitrate with [the] Plaintiff[] Jerry Freishtat on January 12, 2022. Each of these agreements is valid and enforceable under both Texas law and the Federal Arbitration Act.

1. The dispute between the parties falls within the scope of the arbitration agreements[] as it relates to the issuance of unregistered securities pursuant to the investments made by [the] Plaintiffs in accordance with the Subscription Agreements between the parties[.]

Dyno Petro and Young also filed a plea in abatement that made contentions similar to those in their motion to compel.

The Plaintiffs opposed Dyno Petro and Young's effort to compel arbitration and responded that the arbitration agreements were "unenforceable for lack of

6

consideration"; that their claims did not fall within the scope of the agreements; and that arbitration could not be ordered as to Torres, Peguero, and Hunter because they were not signatories to the Subscription Agreements. Dyno Petro and Young specifically responded to the nonsignatory argument by contending that

> Texas case law makes it clear that employees of a company are bound by a valid arbitration clause that the company entered into. Just as artful pleading of torts cannot be used to escape an arbitration agreement, artful pleading by naming individual employees in a lawsuit cannot escape arbitration. This [c]ourt should enforce the arbitration clause[s] in the Subscription Agreement[s] on all parties, including the employees of Dyno Petro . . .

With the pleadings in this state, the trial court conducted a hearing on the motion to compel arbitration. What was said at this hearing created confusion that we must deal with regarding the status of the nonsignatories whom the trial court did not compel to arbitration. Young testified as Dyno Petro's president, and his direct testimony addressed the terms of the Subscription Agreements and Dyno Petro's performance under those agreements.

The status of the nonsignatories at various times in the parties' relationship came into issue during the Plaintiffs' counsel's cross-examination of Young:

> Q. Okay. And I want to briefly just ask you about Maireni Peguero, Arturo Torres, and Darrin Hunter in this matter.
>
> A. Yes, sir.
>
> Q. Can you just briefly describe the relationship between those [D]efendants and Dyno Petro?

7

A. Yes, sir. So starting with Maireni[ Peguero], she is currently my COO of Dyno Petro. Darrin Hunter, he was one of my sales associates, but, unfortunately, we had to part ways. And then Arturo Torres, in the beginning, he kind of started helping us bring in people, but he never officially worked for Dyno Petro.

Q. So he never -- he was never an employee or never officially worked for Dyno Petro?

A. No, sir.

Q. And you mentioned Ms. Peguero is the COO. Is part of her responsibilit[y] as the COO approaching investors or obtaining investments from potential investors?

A. No, sir. And at that time, she was not the COO.

Q. Okay. What was her role at that time?

A. She actually was not employed by the company yet.

Q. Okay.

A. She was associated with Mr. Torres.

Q. Okay. So in December of 2022, neither Arturo Torres [n]or Ms. Peguero was associated with Dyno Petro; is that correct?

A. That's correct.

Q. Okay. What about Mr. Hunter? Was his role with Dyno Petro?

A. I didn't even know him at that time.

Q. Okay.

A. I didn't meet Mr. Hunter until early '24. And then whenever [one of the Plaintiffs] would reach out, he and Darrin would talk.

8

Q. Okay. So what were his primary responsibilities when he worked for Dyno Petro in 2024?

A. Investment relations.

Q. Okay. So communicating with investors?

A. Communicating, yes, sir.

Q. Okay. What about -- was he responsible for obtaining new investments on behalf of Dyno Petro . . . ?

A. New investors, not the investments themselves.

Q. So new investors, new, I guess, potential investments that Dyno Petro could make; is that fair to say?

A. Might be splitting words, but, maybe.

Q. Okay.

A. I find the leases. He was finding the investors to invest in programs we may have.

Hunter's counsel also cross-examined Young. This testimony confirmed that Hunter was not employed by Dyno Petro in 2022 but was employed as a Dyno Petro sales associate in 2024.

Neither Peguero nor counsel representing her appeared at the hearing. Torres appeared pro se at the hearing and offered the following brief testimony:

At the moment of the signing of the contracts, at the signing of the [Private Placement Memorandum] and the rest of the subscriptions with Freishtats, with Mr. Justin and Mr. Jerry Freishtat, I was a part of the team creating awareness for the projects, but I wasn't involved in those conversations. I was recused from those conversations. So who is now or who was at a later point in time Maireni Peguero, she became later the COO after I was recused from the projects after I was removed. For

9

any point in time where I was involved in creating awareness for the Dyno Petro projects, I was never in conversations with the Freishtats. So as I represent myself at the moment, I -- my question would be how would my involvement carry on in the arbitration process?

At the hearing, the parties made general arguments that mimic the ones that they make on appeal. Dyno Petro argued that the broad terms of the arbitration clauses meant that the trial court had to compel arbitration not only of the company but also of its employees. Dyno Petro argued that to do otherwise would allow improper evasion of the arbitration agreements; "[b]ecause a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered by the terms of such agreement." The Plaintiffs countered that Dyno Petro had conceded that Torres and Peguero were not employees, arguing "as you heard testimony from Mr. Young that during the relevant period, Ms. Peguero and Mr. Torres were not employees or affiliated with Dyno Petro, so to the extent that they were acting under an independent capacity, we would seek to hold them liable in this matter." The Plaintiffs however agreed that Hunter was an employee of Dyno Petro. Hunter's counsel waffled as to whether he agreed that the claims against his client should be sent to arbitration.

The parties also disagreed on the question of whether the trial court should send the claims against Dyno Petro and Young to arbitration but not the claims against the other nonsignatory Defendants. The Plaintiffs argued that the case should not be stayed as to these Defendants, and Dyno Petro's and Hunter's counsel argued

that it should. The trial court expressed its own concern that often when cases are referred to arbitration, they languish without an arbitration being filed.

The trial court resolved the matter by granting the motion to compel arbitration as to Dyno Petro and Young only. The trial court also stayed all proceedings "for a period of ninety (90) days from the date of this order." Dyno Petro and Young filed a notice of appeal. Peguero did as well.

### III. Analysis

**A. We reject the Plaintiffs' argument that we lack jurisdiction to consider the question of whether the trial court erred by failing to compel arbitration of the claims against the nonsignatory Defendants who did not file a notice of appeal.**

The Plaintiffs argue that because Hunter and Torres failed to file notices of appeal, we lack jurisdiction to determine whether the trial court erred by not ordering arbitration of the claims against them. We reject this contention.

As the Plaintiffs note, to alter a judgment, a party must file a notice of appeal, and without filing a notice, one is not a party to an appeal. *See* Tex. R. App. P. 25.1(c); *Brumfield v. Williamson*, 634 S.W.3d 170, 192 (Tex. App.—Houston [1st Dist.] 2021, pet. denied). Pivoting off this point, the Plaintiffs then note that parties who file an appeal must show that they have standing to make an argument. *See In re P.R.*, 615 S.W.3d 474, 481–82 (Tex. App.—Texarkana 2020, pet. denied). And the question of standing turns on the impact that the trial court's decision had on that party. As the supreme court has held,

11

> [A]n appealing party may not complain of errors that do not injuriously affect it or that merely affect the rights of others. *See Tex*[.] *Workers' Comp*[.] *Ins. Fund v. Mandlbauer*, 988 S.W.2d 750, 752 (Tex. 1999); *Buckholts Indep. Sch. Dist. v. Glaser*, 632 S.W.2d 146, 150 (Tex. 1982); *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 92 (Tex. 1973); *Shell Petroleum Corp. v. Grays*, . . . 114 S.W.2d 869, 870 ([Tex. [Comm'n Op.]] 1938). The converse proposition, however, is also true: a party whose own interest is prejudiced by an error has standing to appeal. *See Jernigan v. Jernigan*, 677 S.W.2d 137, 140 (Tex. App.—Dallas 1984, no writ) (holding nonparty bound by judgment was entitled to appeal); *see also Gorman v. Gorman*, 966 S.W.2d 858, 864 (Tex. App.—Houston [1st Dist.] 1998, pet. denied)[ (op. on reh'g)].

*Torrington Co. v. Stutzman*, 46 S.W.3d 829, 843 (Tex. 2000). Articulated a bit differently, the supreme court has also held that "[t]o establish standing, a person must show a personal stake in the controversy." *In re B.I.V.*, 923 S.W.2d 573, 574 (Tex. 1996).

The Plaintiffs argue that Dyno Petro has no stake in the trial court's decision not to compel Hunter and Torres to arbitration. Dyno Petro argues that its rights are affected by a decision not to order its alleged agents to arbitration. We conclude that Dyno Petro has the better part of the argument.

As we will discuss below, Dyno Petro invokes the principle that a plaintiff cannot avoid an arbitration agreement by suing a corporation's agents rather than the corporation itself and that the doctrine of direct-benefits estoppel demands arbitration of the Plaintiffs' claims. Thus, Dyno Petro has articulated a stake that it has in the trial court's decision to send the claims against the nonsignatories (whom Dyno Petro contends were its agents) to arbitration.

12

*In re BNP Paribas* directly supports Dyno Petro's argument. Nos. 13-07-353-CV, 13-07-358-CV, 2008 WL 2208933 (Tex. App.—Corpus Christi–Edinburg May 29, 2008, orig. proceeding) (mem. op.). In *BNP*, a party sued a corporation and its agent with respect to an agreement containing an arbitration clause. *Id.* at *1. The trial court denied the corporation's motion to compel arbitration. *Id.* In a mandamus proceeding, the real parties in interest argued that the corporation lacked standing to assert a right to arbitration on behalf of its agent. *Id.* at *3. *BNP* rejected this argument:

> [T]he arbitration agreement was signed by Cruz on behalf of BNP. When the principal, that is, BNP, is bound by a valid arbitration agreement, "its agents, employees, and representatives are covered by that agreement." *Merrill Lynch Tr*[.] *Co. FSB v. Alaniz*, 159 S.W.3d 162, 168 (Tex. App.—Corpus Christi[–Edinburg] 2004, orig. proceeding); *McMillan v. Comput*[.] *Translation Sys. & Support, Inc.*, 66 S.W.3d 477, 481 (Tex. App.—Dallas 2001, orig. proceeding). Accordingly, Cruz, as an employee of BNP, is included in the arbitration agreement at issue. Moreover, as a signatory and party to the arbitration agreement, BNP clearly has standing to assert the right to arbitrate. *In re Choice Homes, Inc.*, 174 S.W.3d 408, 412 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding) ("To have standing a party must be affected by the controversy at hand.").

> We would further note that real parties brought the same causes of action against both BNP and Cruz and alleged concerted, coordinated acts by these parties, and all of real parties' causes of action arise from the same operative facts concerning the payment of extra-contractual fees. *See Brown v. Anderson*, 102 S.W.3d 245, 250 (Tex. App.—Beaumont 2003, pet. denied) (finding substantially interdependent and concerted misconduct where the causes of action against the non[]signatory defendants are "based upon the same operative facts and are inherently inseparable from the causes of action against the signatory-defendant"). Accordingly, we reject the real parties' arguments pertaining to standing.

13

*Id.* at *4.   Dyno Petro makes a similar argument here—that the claims against the nonsignatories are claims against it because the nonsignatories were its agents.   For the reason stated in *BNP*, we conclude that Dyno Petro has standing to make that argument.

Other authority, though less directly on point, also supports Dyno Petro's standing argument.   In *Ascendant Anesthesia PLLC v. Abazi*, a corporate agent who had been sued jointly with his corporate principal appealed an order denying a motion to compel arbitration that the corporation had filed.   348 S.W.3d 454, 457 (Tex. App.—Dallas 2011, no pet.).   The plaintiff in *Ascendant* argued that the agent lacked standing to appeal the denial of the motion to compel because he did not move to compel arbitration.   *Id.* at 461.   *Ascendant* noted that "[t]he general test for standing is whether there is a real controversy between the parties that will actually be determined by the judgment sought" and that standing turned on whether a person had a personal stake in that controversy.   *Id.*   The Dallas Court of Appeals held that the agent had the requisite personal stake:

> Toussaint was named as a third[-]party defendant in this case and was alleged to be jointly liable with Ascendant on the claims asserted as counterclaims and, in a separate part of Abazi's pleading, alleged to be the sole party liable to Abazi for slander.   In its motion to compel arbitration, Ascendant requested arbitration of (1) "all of the claims for damages between Abazi and Ascendant, including the counterclaims asserted by Abazi[,]" and (2) "the claims Abazi asserts against [Toussaint] in his individual capacity."   The trial court denied that motion "in all respects," and a notice of appeal was filed by Ascendant and Toussaint.   We conclude [that] a real controversy exists on appeal with respect to the claims asserted by Abazi against Toussaint and [that]

14

such controversy is one in which Toussaint has a "personal stake." *See
. . . B.I.V.*, 923 S.W.2d at 574; *Tex. Ass'n of Bus.*[ *v. Tex. Air Control Bd.*],
852 S.W.2d [440,] 446 [(Tex. 1993)]. Therefore, we cannot agree with
Abazi that Toussaint lacks "standing" as to this appeal. *See . . . B.I.V.*,
923 S.W.2d at 574; *Tex. Ass'n of Bus.*, 852 S.W.2d at 446.

*Id.* at 461–62.; *see also Nat'l Claims Negots*[.] *LLC v. Guerra*, No. 05-19-00495-CV, 2020 WL 1536246, at *4 (Tex. App.—Dallas Mar. 31, 2020, no pet.) (mem. op.) (rejecting argument that nonsignatory to arbitration agreement lacked standing to seek stay pending arbitration).

Dyno Petro is in essence arguing that the claims made against its agents are claims against it and that it should not have to fight a battle on the same claims on two fronts. As noted above, the Plaintiffs' petition to a certain extent bears out Dyno Petro's claims, and the Plaintiffs conceded during the hearing on the motion to compel arbitration that one of the nonsignatories was acting in an agency capacity. Though we do not agree that the trial court erred in certain regards, Dyno Petro at least has a sufficient personal stake to be able to argue that the trial court erred by not compelling arbitration against the nonsignatories and by forcing it to fight a two-front war. We have jurisdiction to consider that argument.

**B. The trial court did not err by failing to compel arbitration of the Plaintiffs' claims against Torres and Peguero but did err by failing to compel arbitration of the Plaintiffs' claim against Hunter.**

In Dyno Petro and Young's first issue and Peguero's first issue, they argue that the trial court erred by failing to compel arbitration of the Plaintiffs' claims against Torres, Peguero, and Hunter. Though the three were nonsignatories to the

15

Subscription Agreements containing the arbitration clause, Dyno Petro and Peguero argue that they were agents of Dyno Petro and were embraced by the arbitration agreements or that the doctrine of direct-benefits estoppel brought them within its terms. We agree that the evidence established that Hunter was an agent of Dyno Petro and that the claim against him should have been compelled to arbitration. We disagree that the trial court abused its discretion by failing to compel arbitration of the claims against Torres and Peguero.

### 1. Standard of review

The El Paso Court of Appeals recently gave a concise summary of the standards that guide us in reviewing a trial court's decision regarding whether to compel arbitration:

> A party seeking to compel arbitration must establish the existence of a valid arbitration agreement and that the claims raised fall within the agreement's scope. *In re Odyssey Healthcare, Inc.*, 310 S.W.3d 419, 422 (Tex. 2010)[ (orig. proceeding)]. Whether an arbitration agreement is valid and enforceable is a legal question. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). If the moving party meets its burden of establishing a valid agreement, the burden shifts to the party opposing arbitration to raise a valid defense against its enforcement. *See In re McKinney*, 167 S.W.3d 833, 835 (Tex. 2005) . . . (orig. proceeding). Absent evidence of a valid defense, the trial court must compel arbitration. *J.M. Davidson, Inc.*, 128 S.W.3d at 227. Or as our supreme court has noted: "[T]he right to a jury trial is not discretionary. Nor is the right to have an arbitration contract enforced. If the parties have not agreed to arbitration, no trial court has discretion to make them go; if they have agreed to arbitration, no trial court has discretion to let one wriggle out." *In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 193 (Tex. 2007) (orig. proceeding).

16

"Motions to compel arbitration are ordinarily decided in summary proceedings 'on the basis of affidavits, pleadings, discovery, and stipulations.'" *APC Home Health Servs., Inc. v. Martinez*, 600 S.W.3d 381, 388–89 (Tex. App.—El Paso 2019, no pet.) (quoting *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992)[ (orig. proceeding)]). "However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts." *Tipps*, 842 S.W.2d at 269.

We review a trial court's denial of a motion to compel arbitration for abuse of discretion[1] and defer to its factual determinations if they are supported by the evidence; however, we review its legal determinations de novo. *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018); *APC Home Health*, 600 S.W.3d at 389. Because here, the trial court did not enter findings of fact or conclusions of law, we must uphold its decision on any appropriate legal theory urged below. *Id.*

*Vibra Rehab. Hosp. of El Paso, LLC v. Illarramendi*, No. 08-23-00137-CV, 2024 WL 5109427, at *2–3 (Tex. App.—El Paso Dec. 13, 2024, pet. denied) (mem. op. on reh'g).

There is also a question of whether the arbitration agreement at issue is governed by the Federal Arbitration Act (FAA) or the Texas Arbitration Act (TAA). The Subscription Agreements state that they are governed by the federal act but also state that they are governed by Texas law. The question of which act applies has no impact on our analysis. The parties make no argument that the outcome is dependent on which act applies, and generally, "the issue of arbitrability is subject to a virtually

---

[1]Appellants' briefs incorrectly state the standard of review as de novo.

17

identical analysis under either the FAA or the TAA." *Rodriguez v. Tex. Leaguer Brewing Co.*, 586 S.W.3d 423, 427 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).[2]

> **2.** **We reject the contention that the trial court erred by failing to compel arbitration of the claims against Torres and Peguero because they were allegedly Dyno Petro's agents but agree that the trial court erred by concluding that Hunter was not an agent under the arbitration clauses.**

The central question before us is Dyno Petro's and Peguero's argument that the nonsignatories functioned as Dyno Petro's agents and thus were embraced by the Subscription Agreements' arbitration clauses. Dyno Petro and Peguero invoke the principle that a party cannot avoid an arbitration agreement by suing a nonsignatory agent of a signatory. Dyno Petro and Peguero correctly cite the principle but try to camouflage that the testimony of Young introduced a controversy regarding whether Torres and Peguero were Dyno Petro's agents. Facing a state of uncertainty about what Torres's and Peguero's roles actually were, the trial court was given the discretion to deny the motion to compel arbitration as to them. With respect to Hunter, all agree that whatever representations he made were in an agency capacity.

---

[2]There are also a number of arguments that were raised in the Plaintiffs' response to the motion to compel that no longer appear to be at issue. The Appellants' briefing spends some time discussing the issues raised in the response, such as whether the wells subject to the Subscription Agreements were identified with reasonable certainty, whether the agreements were supported by consideration, and if the arbitration agreements were induced by fraud. The Plaintiffs do not respond to these arguments in their Appellees' brief and make no contention that the trial court erred by compelling arbitration of their claims against Dyno Petro and Young. Thus, we conclude that the Plaintiffs have abandoned their arguments that challenge whether the Subscription Agreements' arbitration clauses are enforceable at least as to Dyno Petro and Young.

Thus, we conclude that the trial court erred by not compelling the claims against Hunter to arbitration.

### 3. We set forth the principles of agency that allow nonsignatories to claim that they are protected by an arbitration clause.

The principle that Dyno Petro and Peguero seek to invoke was recently summarized by the El Paso Court of Appeals as follows:

> [A] way that a non[]signatory can compel compliance with an arbitration agreement is by showing "agency." *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 633 (Tex. 2018). As the Texas Supreme Court explains, "a contracting party generally cannot avoid unfavorable clauses by suing the other party's agents"; thus, "an agent of a signatory may sometimes invoke an arbitration clause against another signatory." *Id.* at 635 (quotation marks omitted). The exception recognizes the idea that "it is impractical to require every corporate agent to sign or be listed in every contract." *In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 209 (Tex. 2007) (orig. proceeding). To establish that right, a non[]signatory agent must "show it was subject to the principal signatory's control and authorized to act as its agent." *Jody James Farms . . .*, 547 S.W.3d at 635.

*Vibra Rehab. Hosp.*, 2024 WL 5109427, at *6.

*Vibra* explained that the rationale for the rule that an agent may invoke its principal's arbitration agreement is based on the following reasoning from the Texas Supreme Court:

> [An agent] has a right to compel arbitration under *In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759 (Tex. 2006)[ (orig. proceeding)], which held that agents of a non[]signatory affiliate were entitled to invoke an arbitration clause given that the affiliate was so entitled. 192 S.W.3d at 764. As the *Vesta* court reasoned:
>
>> [C]orporations must act through human agents . . . . When contracting parties agree to arbitrate all disputes "under or

with respect to" a contract (as they did here), they generally intend to include disputes about their agents' actions because "[a]s a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts." If arbitration clauses only apply to contractual signatories, then this intent can only be accomplished by having every officer and agent (and every affiliate and its officers and agents) either sign the contract or be listed as a third-party beneficiary. This would not place such clauses on an equal footing with all other parts of a corporate contract [and would thus not comport with federal and state policy regarding arbitration].

*Id.* at 762 (citation omitted).

2024 WL 5109427, at *7. The question of whether a nonsignatory may enforce an arbitration agreement raises the preliminary question implicated by a motion to compel arbitration—whether there is a valid and enforceable arbitration agreement. *Jody James*, 547 S.W.3d at 633.

### 4. Dyno Petro and Peguero failed to carry their burden to establish that Torres and Peguero were Dyno Petro's agents.

As we noted in the factual summary, the Plaintiffs pleaded that Torres and Peguero represented themselves to be agents of Dyno Petro when they pitched the investment.[3] If Dyno Petro had let this allegation stand, it would have had a strong

---

[3]Whether an arbitration clause covers nonsignatories is a function of "contract law and agency" and a gateway issue for the court to decide. *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011) (orig. proceeding). "[T]he question of '[w]ho is actually bound by an arbitration agreement is [ultimately] a function of the intent of the parties, as expressed in the terms of the agreement.'" *Id.* Here, there is no question that the arbitration clauses embraced "agents or employees." That said, our question turns on proof that the nonsignatories we are dealing with function as agents or employees of Dyno Petro.

argument that these nonsignatories were Dyno Petro's agents. But Dyno Petro muddied the waters when its president—Young—testified on cross-examination as follows:

> Q. Can you just briefly describe the relationship between those defendants and Dyno Petro?
>
> A. Yes, sir. So starting with Maireni[ Peguero], she is currently my COO of Dyno Petro. Darrin Hunter, he was one of my sales associates, but, unfortunately, we had to part ways. And then Arturo Torres, in the beginning, he kind of started helping us bring in people, but he never officially worked for Dyno Petro.
>
> Q. So he never -- he was never an employee or never officially worked for Dyno Petro?
>
> A. No, sir.
>
> Q. And you mentioned Ms. Peguero is the COO. Is part of her responsibilit[y] as the COO approaching investors or obtaining investments from potential investors?
>
> A. No, sir. And at that time, she was not the COO.
>
> Q. Okay. What was her role at that time?
>
> A. She actually was not employed by the company yet.
>
> Q. Okay.
>
> A. She was associated with Mr. Torres.
>
> Q. Okay. So in December of 2022, neither Arturo Torres [n]or Ms. Peguero was associated with Dyno Petro; is that correct?
>
> A. That's correct.

21

After this examination, Dyno Petro's counsel simply let the matter drop and never clarified what the relationship was between Dyno Petro, Torres, and Peguero.

Again, as we have noted, Torres later claimed that he "was a part of the team creating awareness for the projects."  But he never identified who directed or employed that team.  And Peguero did not even attend the hearing.

The Plaintiffs' brief capitalizes on the gap in the proof of what roles Torres and Peguero occupied:

> Here, the principal, by and through Brad Young, testified unequivocally that at the time the representations were made concerning the investments, Peguero "was not employed by the company yet."  She "was associated with Mr. Torres," and Young confirmed that neither Torres nor Peguero were "associated with Dyno Petro" when the representations were made by Peguero about a potential investment.  Young's testimony as to Peguero and Torres was unchallenged.  No documents or testimony show Peguero or Torres received compensation from Dyno Petro related to the transaction with Appellees, held any title at the time Appellees initiated their investment with Dyno Petro, or had Dyno Petro's consent to act on its behalf.  Without any evidence to controvert Young's testimony and support an agency relationship with Dyno Petro, Appellees' claims against Peguero fall outside the scope of the Subscription Agreement[s'] arbitration clause[s].  [Record references omitted.]

As we have noted, it was Dyno Petro's and Peguero's burden to establish their right to arbitration.  *See TotalEnergies E&P USA, Inc. v. MP Gulf of Mex., LLC*, 667 S.W.3d 694, 720 (Tex. 2023) ("A party seeking to compel arbitration must establish the existence of a valid arbitration agreement and that the claims at issue fall within the scope of that agreement.").  The testimony of Dyno Petro's president—rather than clarifying Torres's and Peguero's roles—served only to obscure that information.

22

Young could have clarified their roles but was not asked to do so. Under this circumstance, the trial court did not abuse its discretion by finding that the proof was lacking to show that Torres and Peguero were agents who fell within the ambit of the Subscription Agreements' arbitration clauses.

Nor do Dyno Petro's and Peguero's arguments persuade us why it must be taken as a given that Torres and Peguero were agents:

- First, Dyno Petro seems to argue that the Plaintiffs should be held to their pleading that Torres and Peguero represented that they were Dyno Petro's agents and are now "backtracking." If the Plaintiffs are backtracking, they are following the trail opened to them by Young's testimony that threw open the question of what Torres's and Peguero's relationships were with Dyno Petro.

- Next, Dyno Petro claims that "Mr. Torres stated that, before the Subscription Agreement[s were] executed, he was 'a part of the [*Dyno Petro*] team creating awareness for the projects.'" [Emphasis added.] What Torres actually said was "[a]t the moment of the signing of the contracts, at the signing of the [Private Placement Memorandum] and the rest of the subscriptions with [the Plaintiffs] . . . , I was a part of the team creating awareness for the projects, but I wasn't involved in those conversations." Torres never testified that Dyno Petro controlled the "team." Indeed, Young testified that Dyno Petro never employed Torres. Dyno Petro's attempt to put words in Torres's mouth is not helpful.

- Then, in an argument riddled with assumptions, Dyno Petro argues that Torres and Peguero must have been agents and that the Plaintiffs, as demonstrated by their petition, assumed them to be:

  > Nothing in [the] Plaintiffs' claims or statements indicates that any of the [nonsignatories] acted outside the normal course of business regarding the formation and performance of the Subscription Agreement[s]. [The] Plaintiffs reasonably assumed that all [nonsignatories] by

23

allowing the performance of the Subscription Agreement[s].[4] Further, [the] Plaintiffs do not indicate that the [nonsignatories] acted in their own personal interests. The [nonsignatories] acted on the behest of Dyno Petro and did not at any point act in their own interest. They were not pitching their own deals to the Plaintiffs – they were pitching Dyno Petro's deal. They were not performing on their own contracts with [the] Plaintiffs – they were performing on [the] Plaintiffs' contract with Dyno Petro. The [nonsignatories] did not benefit in any way through their interactions with [the] Plaintiffs other than being compensated by the principal, Dyno Petro.

This paragraph is understandably bereft of record citations. It is a litany of assumptions that may well be logical but are not found in the record. Again, after Young testified, the question was left open of the status of Peguero and Torres vis-à-vis Dyno Petro. Nothing in the record shows that they were subject to the type of control that would have made them agents, that is, they "w[ere] subject to the principal signatory's control and authorized to act as [Dyno Petro's] agent." *See Jody James Farms*, 547 S.W.3d at 635.

- Peguero's brief suffers from failings similar to those in Dyno Petro's brief:

   o Peguero argues that "[t]he record is silent as to when [she] was not an agent or employee of Dyno Petro." That statement is true and is also a deficit for a party bearing the burden of proof on the question of agency.

   o Peguero's brief argues,

      [The] Plaintiffs' claims against the [nonsignatories] allegedly "arise from their pre- and post-contract fraudulent conduct, independent of any obligation pursuant to the Subscription Agreement[s]." This position is nonsensical. How could someone

---

[4]This sentence is quoted verbatim from Dyno Petro's brief and appears to be missing words as it does not make sense.

24

fraudulently induce the Plaintiffs to enter an agreement, on the one hand, but only be "tangentially connected to the transaction" and not part of the agreement on the other? [Record reference omitted.]

The point made is unclear. A person could have a role in selling an investment for her own purposes—such as an independent contractor receiving a commission—and still not occupy the role of an agent.

o   The brief further states, "Maireni Peguero was part of Dyno Petro's 'team' raising awareness about the Transaction." Again, she may have been on a team, but there is no proof who directed that team.

- Both Dyno Petro and Peguero argue that it is clear that Torres and Peguero were acting with "apparent authority" from Dyno Petro. Again, they fail to explain where the proof of that authority is in the record. The Plaintiffs point to the proof requirements to show apparent authority:

    Agency cannot be established by mere association. *See Walker Ins. Serv[s.] v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 550–51 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Agency requires the principal's consent for the agent to act on its behalf, and the principal's control over the agent's action. *Gaines v. Kelly*, 235 S.W.3d 179, 183–84 (Tex. 2007); *Cmty. Health Sys. Pro[.] Servs. Corp. v. Hansen*, 525 S.W.3d 671, 697 (Tex. 2017); *Walker Ins. Servs[.]*, 108 S.W.3d at 549–53. Critically, an alleged agent's statements cannot establish agency. Only the conduct of the principal can. *Gaines*, 235 S.W.3d at 183–84.

As we have noted, the Plaintiffs highlight the failings of the record to address these proof requirements.

At bottom, the record is muddled as to Torres's and Peguero's roles. Dyno Petro left the record in this state by not clarifying their status after Young's cross-

25

examination. Peguero failed to even appear at the hearing.[5] We cannot fault the trial court for its decision in view of the muddy state of the record as to the agency of Torres and Peguero.

### 5. The trial court erred by failing to compel arbitration of the claims against Hunter.

Hunter is a different matter than Torres and Peguero because there is no dispute of his capacity as an agent of Dyno Petro. The Plaintiffs' petition specifically pleaded that Hunter was acting as an officer of Dyno Petro when he made representations:

> 24. In March 2024, . . . Hunter assumed the role of President at Dyno Petro and began serving as the primary point of contact between [the] Plaintiffs and Dyno Petro. After [the] Plaintiffs requested an update pertaining to the Grand Coteau #2's production of oil and gas, Hunter misrepresented the quantity of production in an effort to prevent [the] Plaintiffs from seeking the return of their initial investment and to attempt to entice [the] Plaintiffs to invest more funds with Dyno Petro. Specifically, Hunter represented that the Well was producing 400 barrels of oil per day and that [the] Plaintiffs could expect monthly checks of approximately $7,000 in revenue. These representations were false, as no well on the Grand Coteau Property was producing 400 barrels of oil per day.

> 25. Despite representations that the Well was producing in sufficient quantities to issue disbursement payments to [the] Plaintiffs, [the] Plaintiffs received no such payments. After several months, [the] Plaintiffs contacted Hunter about the payments. During this conversation, Hunter, once again, misrepresented the status of

---

[5]In her brief, Peguero states: "Again, in this case, Maireni Peguero is in agreement with arbitration and requests this [c]ourt send her thereto." Her acquiescence comes too late. Perhaps if she had attended the hearing below, she could have clarified her role with respect to Dyno Petro. She did not do so. Thus, we must analyze the record as it exists.

production, this time indicating that [the] Plaintiffs were entitled to over $40,000, based on Dyno Petro's oil production in December 2023 alone. This was false and yet another attempt to conceal the true nature of the Plaintiffs' investment.

The petition went on to allege a claim of fraud based on the alleged misrepresentations of Hunter:

After [the] Plaintiffs made their initial investments, Young and Hunter continued misrepresenting the nature of the investment to [the] Plaintiffs by stating that the well was producing substantial amounts of oil and gas per day and that [the] Plaintiffs would receive significant disbursement checks from the sale of said oil and gas. At the time these representations were made, both Young and Hunter knew the well was producing very little oil and gas, if any. Hunter and Young knew these representations were false and made them in an effort to keep [the] Plaintiffs from seeking to terminate their contract with Dyno Petro or otherwise assert their rights as a result of Defendants' misrepresentations.

Young testified at the hearing on the motion to compel that Hunter was acting in the capacity of a sales associate when he spoke to the Plaintiffs. Indeed, the Plaintiffs' counsel conceded Hunter's status at the hearing on the motion to compel: "As Your Honor heard the testimony that he was an employee, we would seek to hold him liable to the extent that he was acting outside the course and scope of his employment, but we obviously understand that he was an employee of Dyno Petro at the time."

We do not know why the trial court did not refer the claim against Hunter to arbitration. As we have noted, Hunter's counsel argued at one point that he did not want to be sent to arbitration because of the expense. But counsel later appeared to

27

concede that the claim against Hunter should be compelled to arbitration by noting, "I'm not arguing -- and I haven't because I regretfully agree with [Dyno Petro's counsel] in this matter -- I think the law sides with [Dyno Petro's counsel's] argument."

In their briefing, the Plaintiffs offer no justification for the trial court's decision not to compel arbitration of their claim against Hunter. They merely try to sidestep the issue by arguing that Dyno Petro has no standing to challenge the decision because Hunter did not file a notice of appeal—an argument that we have already rejected.

The Plaintiffs impliedly concede that their fraud claim falls within the scope of the arbitration clauses because it arises out of, is in connection with, or is a result of the Subscription Agreements. Again, the Plaintiffs do not attack the trial court's decision to send their claims against Dyno Petro and Young to arbitration, and the claim against Hunter directly relates to what the Plaintiffs were entitled to receive under the Subscription Agreements.

In essence, the Plaintiffs' fraud claim against Hunter is that there was a misrepresentation of the nature of the performance under the Subscription Agreements. This fraud claim is tied to the Subscription Agreements. As the Texarkana Court of Appeals noted, one cannot artfully plead his way out of an arbitration agreement by recasting his pleading to allege fraud against a corporate agent:

"A court should not deny arbitration unless the court can say with positive assurance that an arbitration clause is not susceptible of an interpretation that would cover the claims at issue." *Osornia*[ *v. AmeriMex Motor & Controls, Inc.*], 367 S.W.3d [707,] 712 [(Tex. App.—Houston [14th Dist.] 2012, no pet.)]. All of [plaintiff's] claims touch on the sale to Chesapeake. [Plaintiff] explicitly seeks reimbursements for paying more than her proportionate share of the costs of negotiation. Without the contract, [plaintiff] would have had no obligation to pay costs of the negotiation. [Plaintiff] also alleges fraud in the inducement and misrepresentation concerning the sale and payment of costs. The Texas Supreme Court has recognized that fraud, fraud in the inducement, and misrepresentation may "arise out of and relate to" a contract. *See Cap*[.] *Income Props.–LXXX v. Blackmon*, 843 S.W.2d 22, 23 (Tex. 1992) (orig. proceeding) . . . ; *In re J.D. Edwards World Sol*[s.] *Co.*, 87 S.W.3d 546, 550 (Tex. 2002) (orig. proceeding) . . . ; *see also Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 & n.[]13 (Tex. 2008) ("[T]he party opposing arbitration must show that the fraud relates to the arbitration provision specifically, not to the broader contract in which it appears . . . ."). The essence of all of [plaintiff's] tort claims is that she was tricked into agreeing to the sale to Chesapeake, tricked into agreeing to form Cabo Blanco, and tricked into assigning her overriding royalties to Cabo Blanco. All of the claims against [appellant] relate to or are connected with the subject matter of the letter agreement—the sale to Chesapeake.

*Glassell Producing Co. v. Jared Res., Ltd.*, 422 S.W.3d 68, 80 (Tex. App.—Texarkana 2014, no pet.) (op. on reh'g). The Plaintiffs' claim against Hunter appears to similarly arise out of the Subscription Agreements—the claim is that he misrepresented the amounts that Plaintiffs were due under the agreements.

*Glassell* then turned to the question we have already examined regarding whether the claims made against a nonsignatory—the signatory corporation's president—were subject to arbitration and "turn[ed] to the issue of whether the claims against [defendant], in his official capacity as an officer and director of [appellant], are subject to arbitration." *Id.* at 81. The opinion disposed of the issue in short order:

29

The Texas Supreme Court has observed that contracting parties generally intend to include disputes about their agents. *Vesta Ins. Grp., Inc.*, 192 S.W.3d at 762–63. Agents "may sometimes invoke an arbitration clause even if they themselves are nonsignatories and a claimant is not suing on the contract." *Kaplan Higher Educ. Corp.*, 235 S.W.3d [at] 209 . . . ; *In re Wells Fargo Bank, N.A.*, 300 S.W.3d 818, 825 (Tex. App.—San Antonio 2009, orig. proceeding). An arbitration clause cannot be avoided by recasting the claims as torts against an owner, officer, agent, or affiliate, and "it is impractical to require every corporate agent to sign or be listed in every contract." *Kaplan Higher Educ. Corp.*, 235 S.W.3d at 209. It is uncontested that [appellant] is a signatory to the letter agreement and [that defendant] is president of [appellant].

We conclude that the claims against [defendant], in his official capacity as officer and director of [appellant], relating to the sale to Chesapeake, the creation of the overriding royalty interests, and the creation of or operations of Cabo Blanco are subject to arbitration.

*Id.*

Here, the Plaintiffs' pleadings, the proof at the hearing on the motion to compel, and the Plaintiffs' concession at the hearing all establish that Hunter was acting as Dyno Petro's agent when he allegedly made misrepresentations about the well's performance that was the subject of the Subscription Agreements. The Plaintiffs are simply trying to recast their claims as torts in an attempt to avoid the reach of the arbitration clauses and their embrace of a nonsignatory who is undisputedly a corporate employee and an agent. The trial court erred by failing to compel the claim against Hunter to arbitration.

### 6. The doctrine of direct-benefits estoppel does not apply to the Plaintiffs' claims.

We have noted that the Plaintiffs do not contest that the fraud allegation against Young should be arbitrated. We have also just held that the fraud claim against Hunter should be arbitrated but that it arises from a different factual context from the one against Torres and Peguero and is guided by the fact that the Plaintiffs concede Hunter's employment status—proof that is lacking as to Torres and Peguero. No matter this failing, Dyno Petro argues that the claims against Torres and Peguero should still be sent to arbitration under the doctrine of direct-benefits estoppel. The foundation of Dyno Petro's theory is that the Plaintiffs are attempting to derive a benefit from the Subscription Agreements and that they should also bear their burden in the form of the arbitration clauses. We conclude that this argument misapprehends the doctrine of direct-benefits estoppel. The Plaintiff's fraudulent-inducement claims arise under general obligations of the law and are not couched as fraudulent-inducement claims against Dyno Petro's agents that would require them to be compelled to arbitration. Next, fraudulent-inducement claims may relate to a contract but do not necessarily rely on the contract induced and thus gave the trial court another basis not to compel arbitration of the claims against Torres and Peguero.

We quote the Plaintiffs' allegations of fraud against Torres, Peguero, and Young:

> 33. On or about December 3, 2022, and in the weeks that followed, Dyno Petro, by and through its employees, Torres and Peguero, and its

owner, Brad Young, represented to [the] Plaintiffs [that] they were offering an investment in the working interest of a new well being drilled on the Grand Coteau Property and that, should [the] Plaintiffs invest, it would be very profitable. Specifically, Torres, Peguero, and Young affirmatively represented to [the] Plaintiffs that expected cash flow based on a $20,000 investment was $3,770–$5,000 and that a minimum return on investment was 150%. Dyno Petro and Young further represented that an existing well on the Grand Coteau Property was producing 450 barrels of oil per day already.

34. These representations concerning the investment were false as there was no well on the Grand Coteau Property producing oil or gas in December 2022. Torres, Peguero, and Young were aware that the representations were false and that Dyno Petro was not drilling a new well on the Grand Coteau Property[] and had no intention to do so. Instead, Dyno Petro planned to rework an existing well that had not been in production since 2018. At the time these representations were made, Torres, Peguero, and Young either knew the representations were false or made the representations recklessly without knowledge of the truth. Torres, Peguero, and Young used these false representations to induce [the] Plaintiffs to transfer money to Dyno Petro.

We interpret these allegations as a claim that the Plaintiffs were fraudulently induced to enter the Subscription Agreements.

The supreme court has described the parameters of the doctrine of direct-benefits estoppel as follows:

Direct-benefits estoppel applies to parties who seek "to derive a direct benefit" from a contract with an arbitration agreement. This estoppel theory precludes a plaintiff from seeking to hold the non[]signatory liable based on the terms of an agreement that contains an arbitration provision while simultaneously asserting the provision lacks force because the defendant is a non[]signatory. Simply put, a person "cannot both have his contract and defeat it too." When a claim depends on the contract's existence and cannot stand independently—that is, the alleged liability "arises solely from the contract or must be determined by reference to it"—equity prevents a person from avoiding the arbitration clause that was part of that agreement. But "when the substance of the

32

claim arises from general obligations imposed by state law, including statutes, torts and other common law duties, or federal law," direct-benefits estoppel is not implicated even if the claim refers to or relates to the contract or would not have arisen "but for" the contract's existence.

*Jody James Farms*, 547 S.W.3d at 637 (footnotes omitted).

*Jody James Farms* gave contrasting examples of cases in which the doctrine applied and those where it did not, contrasting a claim in which the doctrine applied because claims were based on the duties specified in a trust agreement and a case where it did not because the claims related only to a contract and were based on general legal obligations. *Id.* at 637–38 (citing and comparing *Rachal v. Reitz*, 403 S.W.3d 840 (Tex. 2013), *with G.T. Leach Builders v. Sapphire V.P.*, 458 S.W.3d 502 (Tex. 2015)). The doctrine did not apply in *Jody James Farms* because "[r]ather than relying on [the contract at issue], Jody James's complaint premise[d] the Agency's liability on tort and DTPA duties that are general, non-contract obligations." *Id.* at 638.

So, our first task is to determine the source of the duty for the fraudulent-inducement claim that the Plaintiffs are making and whether a claim of that nature (against what can be concluded to be a non-agent) can be compelled to arbitration. The supreme court's holding in *Kaplan* guides our answer. 235 S.W.3d at 209.

In *Kaplan*, students sued claiming that they were fraudulently induced to enroll in the Kaplan program. *Id.* at 208. They tried to avoid an arbitration agreement by suing nonsignatories to the contract at issue. *Id.* We quote extensively from *Kaplan*'s rationale:

33

Although alleged in various forms, the substance of the students' claim was fraudulent inducement, as they seek refunds of tuition and other costs they would not have incurred had they not been induced to sign up. *See* [*In re*] *Weekley*[ *Homes, L.P.*], 180 S.W.3d [127,] 131–32[ (Tex. 2005) (orig. proceeding)] (stating that arbitrability "turns on the substance of the claim, not artful pleading"); *Haase v. Glazner*, 62 S.W.3d 795, 797–800 (Tex. 2001) (distinguishing fraudulent inducement from other fraud claims as it "presupposes that a party has been induced to enter a contract"). We have held that such claims fall within an agreement to arbitrate all disputes "involving" an underlying contract. *See . . . J.D. Edwards World Sol*[*s.*] . . . , 87 S.W.3d [at] 550–51 . . . . Clearly, the students' complaints arise out of and relate to their enrollment agreements.

We disagree with Kaplan that the students are suing on those agreements. "Claims must be brought on the contract (and arbitrated) if liability arises solely from the contract . . . . [C]laims can be brought in tort (and in court) if liability arises from general obligations imposed by law." *Weekley*, 180 S.W.3d at 132. Claims of fraudulent inducement arise from general obligations imposed by law, not the underlying contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006) ("The duty not to fraudulently procure a contract arises from the general obligations of law rather than the contract itself[] and may be asserted in tort even if the only damages are economic."); *Formosa Plastics Corp. USA v. Presidio Eng'rs* [*&*] *Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998) [(op. on reh'g)] ("[I]t is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself.").

Nevertheless, the agents of a signatory may sometimes invoke an arbitration clause even if they themselves are nonsignatories and a claimant is not suing on the contract. Thus, if two companies sign a contract to arbitrate disputes, one cannot avoid it by recasting a contract dispute as a tortious[-]interference claim against an owner, officer, agent, or affiliate of the other. . . . *Vesta Ins. Gr*[*p.*], 192 S.W.3d [at] 762–63 . . . . "Every contract claim against a corporation could be recast as a tortious[-]interference claim against its agents," and it is impractical to require every corporate agent to sign or be listed in every contract. *Id.* at 762. As a contracting party generally cannot avoid unfavorable clauses by suing the other party's agents, this rule is necessary "'to place arbitration agreements on equal footing with other contracts[.']" *Id.*

(quoting [*Equal Emp. Opportunity Comm'n*] *v. Waffle House, Inc.*, 534 U.S. 279, 293, 122 S. Ct. 754, [764] (2002)).

> For the same reasons, the same rule must apply when a party to an arbitration contract seeks to avoid it by pleading a contract dispute as fraudulent inducement by an officer, agent, or affiliate of the other. Here too, almost every contract claim against a corporation could be recast as a fraudulent[-]inducement claim against the agents or employees who took part in the negotiations preceding it. If such arbitration clauses are enforceable only if every officer, employee, agent, or affiliate signs or is listed in the contract, they would be more easily avoided than other contract clauses.

*Id.* at 208–09 (footnote omitted).

Thus, *Kaplan* holds that a fraudulent-inducement claim is a claim based on general obligations imposed by law and not the terms of the contract. But the fact that the cause of action arose not from a contract but from a general obligation was not sufficient to avoid arbitration when the fraudulent-inducement claim was alleged against an agent. It is simply too easy to recast a contract claim into a fraudulent-inducement claim against an agent and avoid the arbitration clause. But here, it was within the trial court's discretion to conclude that this concern was not in play. The proof left the trial court in the dark on what status, if any, Torres and Peguero held in Dyno Petro when they allegedly made representations to the Plaintiffs. Thus, the trial court was within the realm of reasonable disagreement to conclude that *Kaplan*'s concern did not adhere and that the Plaintiffs were alleging a fraudulent-inducement claim that hinged on general obligations of the law and that was not made as a subterfuge against a person proven to be an agent of the signatory corporation.

*Jody James Farms* notes a similar principle that a claim that relates only to a contract is not sufficient to trigger the application of direct-benefits estoppel. 547 S.W.3d at 637. The supreme court has defined the parameters of whether a claim "relates to" a contract as follows:

> It is not enough, however, that the party's claim "relates to" the contract that contains the arbitration agreement. [*In re*] *Kellogg Brown & Root*[, *Inc.*], 166 S.W.3d [732,] 741[ (Tex. 2005) (orig. proceeding)]. Instead, the party must seek "to derive a direct benefit"—that is, a benefit that "stems directly"—from that contract. *Id.*; *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 184 (Tex. 2009)[ (orig. proceeding)]. The claim must "depend on the existence" of the contract, *Meyer*[ *v. WMCO-GP, LLC*], 211 S.W.3d [302,] 307[ (Tex. 2006)], and be unable to "stand independently" without the contract, *Kellogg Brown & Root*, 166 S.W.3d at 739–40. The alleged liability must "arise[ ] solely from the contract or must be determined by reference to it." *Weekley Homes*, 180 S.W.3d at 132. But "when the substance of the claim arises from general obligations imposed by state law, including statutes, torts and other common law duties, or federal law," rather than from the contract, []direct[-]benefits[] estoppel does not apply, even if the claim refers to or relates to the contract. *Morgan Stanley*, 293 S.W.3d at 184 n.2; *see also Kellogg Brown & Root*, 166 S.W.3d at 740–41 (holding that subcontractor's quantum meruit claim against contractor did not justify direct[-]benefits estoppel to compel arbitration under contract between contractor and owner).

*G.T. Leach Builders*, 458 S.W.3d at 527–28 (footnote omitted).

Applying a principle similar to that enunciated in *G.T. Leach Builders*, a federal court concluded that although a fraudulent-inducement claim may relate to a contract, it does not rely on the contract:

> Therefore, the [c]ourt proceeds to address the equitable[-]estoppel issues surrounding [Defendants who were nonsignatories to the arbitration agreement]. Although Defendants assert that they have satisfied the first basis for equitable estoppel (concerning reliance on the terms of the

36

agreement), the [c]ourt does not find this argument compelling. In *Positive Software v. New Century Mortgage Corp.*, the plaintiff listed various causes of action, including copyright infringement, misappropriation of trade secrets and intellectual property, conversion, fraud, violation of the Digital Millennium Copyright Act, and civil conspiracy. 259 F. Supp. 2d [531,] 540 [(N.D. Tex. 2003)]. The *Positive Software* court stated that "[w]hile some of these claims, such as misappropriation of trade secrets and intellectual property, may presume the existence of the Software Subscription Agreement, each claim does not rely upon the terms of the Software Subscription Agreement. Therefore, the first independent basis for equitable estoppel is not met." *Id.* The instant case is quite similar, as many of the Plaintiff's claims, such as fraudulent inducement and misrepresentation, presume the existence of the agreements rather than rely strictly on the language found within them. For this reason, the [c]ourt holds that the first basis for equitable estoppel has not been satisfied.

*Double G Energy, Inc. v. AT Gas Gathering, Inc.*, No. Civ.A 3:05-CV-0749-P, 2005 WL 1837953, at \*8 (N.D. Tex. July 28, 2005) (mem. op. & order).[6]

Under *Double G Energy*'s reasoning, the fraudulent-inducement claim that the Plaintiffs pleaded against Torres and Peguero did not depend on the existence of the Subscription Agreements. Thus, the trial court did not err by failing to compel arbitration of that claim because of the relationship between those contracts and the claim.

In its final argument invoking the doctrine of direct-benefits estoppel, Dyno Petro argues that the Subscription Agreements are so directly related to the Plaintiffs'

---

[6]We rely on this federal opinion because Dyno Petro, at least in part, relies on the FAA. Further, even when dealing with the TAA, federal precedent is persuasive because of similarities in Texas and federal law. *See Brady v. Brady*, Nos. 02-23-00163-CV, 02-23-00164-CV, 2024 WL 637266, at \*9 n.12 (Tex. App.—Fort Worth Feb. 15, 2024, pet. denied) (mem. op.).

claims that Torres and Peguero may invoke the arbitration clauses because they will rely on a defense contained in those agreements. Specifically, the provision limits the ability of the Plaintiffs to rely on representations not contained in the Subscription Agreements. But the provision also limits its embrace to agents and employees. For the reasons we have given, the trial court did not abuse its discretion in deciding that such a proviso did not encompass Torres and Peguero.

Dyno Petro also argues that Torres and Peguero will invoke the following provision, which we highlight as it is highlighted in Dyno Petro's brief:

> I have relied solely on the information contained in the Memorandum and the attachments thereto and the answers to questions with respect thereto furnished to me by the Company, and further, **I hereby warrant that no representations or warranties have been made to me by the Company or its agents as to the tax consequences of this investment, or as to any profits, losses or cash flow which may be received or sustained as a result of this investment, other than those contained in the Memorandum**, and that my decision to invest in the Program has been based solely upon the information found within the Memorandum and **no other oral statements made by the Company, its agents[,] or employees**;
>
> I have knowledge and experience in financial and business matters and am capable of evaluating the merits and risks of an investment in the Program, and am able to bear the economic risks of my purchase, and, furthermore, I have had the opportunity to consult with my own attorney, accountant[,] and/or purchaser representative regarding an investment in the Program; and
>
> I understand that the projections of potential production results and the reserve estimates included in the Memorandum and/or in the exhibits thereto are merely estimates of possible results and not predictions of actual results, understand that such projections have been based on a very favorable level of production for a specified period of time, **which sustained level of production I understand cannot be**

**assured by the Company, and accordingly, I have not relied on such projections as a representation, warranty[,] or promise of future results** of an investment in this Program.

The highlighted portion of the first paragraph is tied to Dyno Petro's agents and employees. We have outlined ad nauseum how Dyno Petro created a situation in which the trial court was vested with the discretion to question whether such a provision applied to Torres and Peguero. The highlighted portion of the third paragraph states that production estimates cannot be assured "by the Company." We cannot say that such provisions make the contract so related to the Plaintiffs' claims as to trigger direct-benefits estoppel when the representation arguably was made by a person who did not represent Dyno Petro.

> **7.    Under the circumstances here, the terms of the arbitration clauses are so vague as to Torres's and Peguero's status that the trial court had discretion to not enforce them.**

Again, the testimony adduced at the hearing left the status of Torres and Peguero in an ambiguous stance. Left to apply the language of the arbitration agreements to that ambiguous stance, the trial court had another basis to exercise its discretion not to compel the claim against them to arbitration. Courts applying the cases cited by the supreme court in *G.T. Leach Builders* hold that when confronted with parties in an ambiguous status with respect to the promotion of an investment, a trial court does not abuse its discretion by refusing to compel arbitration of the claims against the promoter. *Sunbelt Sec., Inc. v. Mandell*, No. 01-21-00209-CV, 2023 WL 1112514, at *12 (Tex. App.—Houston [1st Dist.] Jan. 31, 2023, pet. denied) (mem.

op.).  The question in *Sunbelt* was whether a reference to a "broker/dealer" in an arbitration agreement was a clear agreement to arbitrate when the party seeking to invoke that clause was not identified by name and the agreement did not define the duties of a "broker/dealer."  *Id.*

Initially, *Sunbelt* noted that

> although there is a strong presumption favoring arbitration, that presumption arises only after the party seeking to compel arbitration proves a valid arbitration agreement exists. *Kellogg Brown & Root . . .* , 166 S.W.3d at 737; *see also Carr v. Main Carr Dev., LLC*, 337 S.W.3d 489, 496 (Tex. App.—Dallas 2011, pet. denied) ("Even the exceptionally strong policy favoring arbitration cannot justify requiring litigants to [forgo] a judicial remedy when they have not agreed to do so.").  The parties' agreement to arbitrate must be clear, *see Trico Marine Servs.*[ *v. Stewart & Stevenson Tech. Servs., Inc.*], 73 S.W.3d [545,] 548[ (Tex. App.—Houston [1st Dist.] 2002, orig. proceeding [mand. denied])], including the identity of the parties who have agreed to arbitrate.  *See VSR Fin. Servs., Inc. v. McLendon*, 409 S.W.3d 817, 827–29 (Tex. App.—Dallas 2013, no pet.); *see also McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994) ("The federal policy [favoring arbitration], however, does not extend to situations in which the identity of the parties who have agreed to arbitrate is unclear.").

*Id.*

*Sunbelt* highlighted that the agreement that the party seeking arbitration wished to enforce left the term "broker/dealer" undefined.  *Id.* at *13.  *Sunbelt* explained how an opinion from the Dallas Court of Appeals supported a conclusion that there was no clear agreement to arbitrate:

> We find this case to be analogous to *VSR Financial Services*, 409 S.W.3d at 827–29, [in which] the Dallas Court of Appeals considered a similar issue.  There, the appellees sued VSR and the Chapman defendants, who provided accounting services and investment advice, for an investment

40

loss sustained by appellees. *Id.* at 821–22. Appellees opened brokerage accounts and signed a "VSR New Account Form," which identified VSR by name and was signed by one of the Chapman defendants in the capacity of a "Registered Rep." *Id.* at 822. The "VSR New Account Form" did not contain an arbitration clause. *Id.* The appellees also signed account agreements, which contained an arbitration clause encompassing disputes between the account owner and the "Introducing Firm, Clearing Agent[,] and any Sub-Advisor (and/or any other agent)," and incorporated by reference terms and conditions that contained an identical arbitration provision as the account agreement. *Id.* The term "Introducing Firm" was not defined in either the account agreement or the terms and conditions, nor was VSR or any other entity declared to be the "Introducing Firm" in either document. *Id.*

Considering whether VSR and the Chapman defendants could enforce the arbitration provisions against the appellees, the Dallas court noted that VSR is not a named party to the Agreements, there is no definition in the Agreements or the Terms and Conditions of the term "Introducing Firm," and neither the Agreements nor the Terms and Conditions declare VSR or any other entity to be the "Introducing Firm." *Id.* at 828. The court rejected VSR's argument that the evidence could not be construed "in any way other than concluding that reference to the Introducing Firm was intended to mean VSR," explaining that "the question is not whether we believe VSR could be the 'Introducing Firm,' [but rather] the trial court abused its discretion [by] concluding [that] there was no clear agreement between VSR and appellees to arbitrate." *Id.* at 828–29. The court concluded that the trial court should not have found a valid, enforceable agreement between VSR and appellees to arbitrate[] and thus[] did not abuse its discretion [by] denying the motions to compel arbitration. *Id.* at 829.

*Id.* With the lack of clarity in the arbitration agreement, *Sunbelt* held that the trial court did not abuse its discretion by refusing to compel arbitration because the appellants "failed to carry their burden to establish the existence of a valid and enforceable arbitration agreement between them and [the appellees]." *Id.* at *14.

41

Here, Torres and Peguero are left in limbo as to their status. Again, Young's testimony leaves their status as not being employed by Dyno Petro, and Peguero did not even bother to appear at the hearing on the motion to compel to clarify her status or to make the arguments that are in her brief. This left the trial court in its own limbo about whether the arbitration clauses in the Subscription Agreements embraced Torres and Peguero and whether in view of the open question as to their roles, the arbitration clauses identified them clearly enough to conclude that they reached Plaintiffs' claims against them.

We sustain the first issue as to Hunter and hold that the trial court erred by failing to refer the claims made against him to arbitration; we overrule the remainder of Dyno Petro's and Peguero's first issues.

### C.    We remand this matter to the trial court to reformulate its stay.

In Dyno Petro and Young's second and third issues and in Peguero's second issue, Appellants also complain about the trial court's stay order stating that "all proceedings are hereby stayed for a period of ninety (90) days from the date of this order."[7] The

---

[7]Dyno Petro and Young predicated their second issue on the FAA's stay provision, which provides that

[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has

42

arguments revolve around whether a stay was warranted; obviously, the trial court concluded that one was warranted as it imposed a stay. But the stay that the trial court imposed has now expired.[8] We conclude that this matter should be remanded to the trial court for it to exercise its discretion to reformulate a stay in accordance with the guidance that we provide on the law that governs the exercise of that discretion.

We recently discussed the standards for granting a stay (or abatement) of litigation involving nonsignatories to an arbitration agreement when claims made in the litigation by the signatories are compelled to arbitration. *See Kirby v. Stratus Dominion Anesthesia Assocs., PLLC*, No. 02-24-00463-CV, 2025 WL 1006283, at \*2–6 (Tex. App.—Fort Worth Apr. 3, 2025, pet. filed) (mem. op.). After noting that an abuse-of-discretion standard of review is applied to a trial court's stay decision, we cited the FAA's mandatory stay provision. *Id.* at \*2 (citing 9 U.S.C.A. § 3). We then stated the circumstances under which claims made by a nonsignatory must be stayed:

---

been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C.A. § 3.

Dyno Petro and Young's third issue relies on the TAA's stay provision, which provides that "[t]he court shall stay a proceeding that involves an issue subject to arbitration if an order for arbitration or an application for that order is made under this subchapter" and that "[t]he stay applies only to the issue subject to arbitration if that issue is severable from the remainder of the proceeding." Tex. Civ. Prac. & Rem. Code Ann. § 171.025.

[8]The reply brief filed by Dyno Petro and Young notes that the stay expired on September 9, 2025.

43

Under the FAA, the claims of a non[]signatory to an arbitration agreement must be stayed pending the outcome of the arbitration between other parties if

> (1) the arbitrated and litigated disputes involve the same operative facts, (2) the claims asserted in the arbitration and litigation are "inherently inseparable," and (3) the litigation has a "critical impact" on the arbitration. *In re Devon Energy Corp.*, 332 S.W.3d 543, 548 (Tex. App.—Houston [1st Dist.] 2009, [orig. proceeding]) (quoting *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 343 (5th Cir. 2004)); *see also* 9 U.S.C.[A.] § 3 (providing for a stay of litigation pending arbitration).

*Estate of Moncrief*, 699 S.W.3d 315, 331 (Tex. App.—Fort Worth 2024, pet. filed) (op. on reh'g) (quoting *In re Hous. Progressive Radiology Assocs., PLLC*, 474 S.W.3d 435, 449–50 (Tex. App.—Houston [1st Dist.] 2015, [no pet.])).

*Id.* at *2–3.

Noting that the stay generally applies to the parties to the arbitration agreement, we described the circumstances under which a stay is required of the claims made against nonsignatories:

> Generally, the mandatory stay applies only to parties to an arbitration agreement. *See* [*Devon Energy*, 332 S.W.3d at 548]. Claims against a non[]signatory may be stayed if the "issues presented in the nonparty–party litigation if litigated would have rendered the arbitration redundant and thwarted the federal policy favoring arbitration." *Id.* (quoting *Zuffa, LLC v. HDNet MMA 2008 LLC*, 262 S.W.3d 446, 450 (Tex. App.—Dallas 2008, no pet.)). "[T]he fact that nonarbitrable claims against third parties are based on facts related to arbitrable claims does not alone make a stay of those claims necessary." *Diligent Tex. Dedicated LLC v. York*, No. 02-17-00416-CV, 2018 WL 4140637, at *5 (Tex. App.—Fort Worth Aug. 30, 2018, pet[s]. denied) (mem. op.). "The question is not ultimately one of weighing potential harm to the interests of the non[]signatory[] but of determining whether proceeding with litigation

44

will destroy the signatories' right to a meaningful arbitration." *Zuffa LLC*, 262 S.W.3d at 450 (quoting *Waste Mgmt., Inc.*, 372 F.3d at 343).

*Kirby*, 2025 WL 1006283, at *5. Not surprisingly, the parties before us take contrasting views regarding whether a stay against the nonsignatories is warranted. Dyno Petro and Young argue that a stay is warranted because

> [w]hen claims against signatories and nonsignatories are based on the *same* investment, with the *same* payments to be derived from the investment, and the claims require findings of whether payments on such investment have been made, the litigation with the nonsignatories will critically impact the signatories' arbitration – specifically because it could subvert the signatories' right to meaningful arbitration by deciding issues subject to the arbitration.

The Plaintiffs counter that

> [t]he claims against Torres, Peguero, and Hunter turn on factual issues distinct f[ro]m those that will be addressed in the arbitration against Young and Dyno Petro. The arbitration proceeding will involve . . . Young and Dyno Petro's liability in the context of the terms of the Subscription [A]greement[s] executed with Appellees. In contrast, the claims against the non[]signatories[—]Torres, Peguero, and Hunter[—] will address whether the non[]signatories engaged in independent tortious conduct outside the scope of the Subscription Agreement[s]. No risk exists that the [c]ourt's determinations will preempt or contradict the arbitrator's authority over the issues subject to arbitration in this matter.

But the Plaintiffs do not argue that the trial court's decision to grant a stay was an abuse of discretion; instead, they title their argument as follows: "The trial court acted within its discretion in issuing a limited stay."

Thus, one party argued for a stay, which the trial court imposed, and the other does not challenge that decision. Instead, the issue in Dyno Petro, Young, and

45

Peguero's attack is that in essence a ninety-day stay was no stay at all—an issue that we do not resolve in view of the fact that the stay has expired and that we are remanding for the trial court to reformulate its stay. We do note that a trial court has the discretion to limit the duration of a stay as an incentive to ensure that an arbitration proceeding is diligently filed and prosecuted. Below, the trial court attempted to engage with Hunter's counsel on this issue:

> So let me ask you a question. One frustration that the [c]ourt feels not with this particular case but in other cases where it's an appropriate referral to arbitration, the [c]ourt signs the order, the [c]ourt stays the case, and then nobody does anything on the arbitrations. They just sit there like lumps on a log. And a year goes by, and they still don't even have a date set. Sometimes they don't even have the arbitrator selected. How can the [c]ourt move its docket with the requirements that I'm sure you're very well aware of if parties aren't going to actively engage in the arbitration process once they are referred to arbitration pursuant to the orders?

Counsel for Hunter offered little help to the trial court: "Short of the [c]ourt['s] ordering arbitration [to] take place within a certain period of time, I can't answer that. I can't instruct the [c]ourt on an opinion either way." Dyno Petro's counsel argued that the stay should be imposed because of its status as "principal" and because otherwise it would have to fight on two fronts. It appears that the trial court resolved the issue by limiting the duration of the stay.

We quote from a federal court's opinion that described the discretion that a trial court has to formulate a stay involving a nonparty to an arbitration procedure, which includes the discretion to formulate a stay of moderate bounds:

46

> The decision to stay is incidental to the [c]ourt's inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v.* [*N.*] *Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163[], 165[] . . . (1936). A [c]ourt has broad discretion to grant a stay in one case "to abide the proceedings in another [proceeding;]" this is true even in situations wherein the two proceedings involve different parties or different issues. *Id.* (holding that the [c]ourt is "unable to assent to the suggestion that before proceedings in one suit may be stayed to abide the proceedings in another, the parties to the two causes must be shown to be the same and the issues identical.")[; *s*]*ee also Clinton v. Jones*, 520 U.S. 681, 706, 117 S. Ct. 1636, [1650] (1997). In exercising this discretion, a court "must weigh competing interests and maintain an even balance." *Id.*[] at 255. Any such stay must be kept within the "bounds of moderation." *Id.* at 256.
>
> The [c]ourt also has "discretion to stay . . . ." *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1518 (10th Cir. 1995); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, [20] n.23, 103 S. Ct. 927, [93 n.23] . . . (1983) (stating that "it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration"). "[C]onsiderations of judicial efficiency" are to be considered in granting such a stay. *Coors*, 51 F.3d at 1518. A court should also consider whether a stay will "avoid confusion and inconsistent results," "unduly prejudice the parties," or "create undue hardship." *Ronning Eng'g Co. v. Adkins Energy*, No. 04-2096-CM, 2006 WL 2038024, at *1–2 (D. Kan. July 18, 2006) [(mem. & order);] *Gouger v. Citibank NA*, No. 19-2434, 2020 WL 1320723, at *3 (D. Kan. Mar[.] 20, 2020)[ (mem. & order)].

*Edelman Fin. Engines, LLC v. Mariner Wealth Advisors, LLC*, No. 23-2515, 2024 WL 663401, at *3 (D. Kan. Feb. 16, 2024) (mem. & order). As another court has noted, courts should avoid a stay that puts a case in limbo. *NTCH–W. Tenn., Inc. v. ZTE USA, Inc.*, No. 1:11-cv-01169, 2014 WL 4444037, at *2 (W.D. Tenn. Sept. 9, 2014) (order).[9]

---

[9]As *NTCH* noted,

But at this point, the trial court's stay has expired; the ninetieth day after the order was September 9, 2025. The parties have not reported to this court whether the trial court has extended the stay, and we assume that it has not been extended. Thus, the claims that have been compelled to arbitration appear to no longer be stayed as they should be. *See* 9 U.S.C.A. § 3; Tex. Civ. Prac. & Rem. Code Ann. § 171.025. Further, the trial court should have an opportunity to exercise its discretion to formulate a stay that addresses claims that are not subject to arbitration. As the Beaumont Court of Appeals recently noted,

> "[I]ssues that are not the subject of arbitration need not be stayed until the arbitration is concluded." *Star Sys. Int'l v. 3M Co.*, No. 05-15-00669-CV, 2016 WL 2970272, at *4 . . . (Tex. App.—Dallas May 19, 2016, no pet.) (mem. op.). Because the trial court denied arbitration in its entirety, it has not addressed whether to stay any non[]intertwined claims pending the outcome of the construction disputes. "Generally, courts recognize that a trial court may stay litigation of non[]arbitrable claims as a matter of its discretion to control its docket." *Chi. Bridge & Iron Co. (Del.) v. Delman*, No. 09-14-00468-CV, 2015 WL 1849669, at *3 . . . (Tex. App.—Beaumont Apr. 23, 2015, no pet.) (mem. op.). Therefore, whether to

---

The moving party must also demonstrate that the stay will not be "immoderate" in duration or scope. [*Landis*, 299 U.S. at 256–57, 57 S. Ct. at 167]; *see also Ohio Env['t] Council v. U.S. Dist. Court, S. Dist. [o]f Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir. 1977) ("[T]he burden is on the party seeking the stay to show that there is a pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the [stay]."). A court must exercise sound discretion in entering a stay[] "since a party has a right to a determination of its rights and liabilities without undue delay." [*Ohio Env't Council*, 565 F.2d at 396]. *In Ohio Env['t] Council*, the Sixth Circuit held that the district court abused its discretion in issuing an unlimited stay that had the potential to "place this case in limbo for years." *Id.*

2014 WL 4444037, at *2.

48

stay any non[]intertwined claims is left to the trial court's sound discretion, subject to further review by this [c]ourt as necessary.

*Beach Club Condos. v. Shoreline on Lake Conroe Condo. Ass'n*, No. 09-24-00304-CV, 2025 WL 1521440, at *8 (Tex. App.—Beaumont May 29, 2025, no pet.); *see also In re Estate of Shimotsu*, Nos. 13-25-00336-CV, 13-25-00337-CV, 2025 WL 2435944, at *12 (Tex. App.—Corpus Christi–Edinburg Aug. 25, 2025, no pet. h.) (mem. op.) ("[B]ecause the trial court denied arbitration in its entirety, it has not addressed whether to stay any of the claims at issue pending the outcome of the disputes pertaining to those matters devoted to arbitration.").

Thus, we remand this matter to the trial court to reformulate its stay. Subject to our further review, the claims that the trial court has compelled to arbitration should be reasonably stayed. When formulating that stay, the trial court should decide how the claims that were not sent to arbitration should be stayed.

We sustain Dyno Petro and Young's second and third issues and Peguero's third issue to the extent that we remand this matter to the trial court to formulate a stay in view of the fact that the stay it had imposed has now expired and in view of the ruling contained herein.

## IV. Conclusion

We overruled the Plaintiffs' contention that Dyno Petro has no standing to challenge the trial court's failure to compel the claims made against the nonsignatories to arbitration. Having reached the merits of Dyno Petro's first issue, we overruled it

49

to the extent that it challenged the trial court's refusal to refer the claims against Torres and Peguero to arbitration. We sustained the first issue as to Hunter and held that the trial court erred by failing to refer the claims made against him to arbitration. We overruled Peguero's first issue that the trial court erred by failing to compel arbitration of the claims made against her. We sustained Dyno Petro and Young's second and third issues and Peguero's second issue and therefore remand this matter to the trial court to reformulate its stay.

Thus, with two exceptions, we affirm the trial court's order. We reverse only that portion of the order that denied Dyno Petro and Young's motion to compel arbitration with respect to the Plaintiffs' fraud claim made against Hunter, and we order that claim to arbitration. We remand this matter to the trial court to reformulate its stay.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: October 16, 2025